**FOUR STATES GROCERY CO. et al. v. GRAY.**

No. 13409.

Court of Civil Appeals of Texas. Fort Worth.

Oct. 2, 1936.

Rehearing Denied Oct. 30, 1936.

J. R. Black, of Fort Worth, for appellants.

Julien C. Hyer and A. W. Christian, both of Fort Worth, for appellee.

SPEER, Justice.

This suit was instituted by R. E. Gray against the Four States Grocery Company, a corporation, and the individual members of the firm, alleged to be Sam Hitri and James Pinto Jr., in the county court at law, No. 2, in Tarrant county, Tex. We shall refer to the parties plaintiff and defendants as they appeared in the trial court.

Plaintiff alleges as a basis for his cause of action that, on about October 31, 1934, he went into the place of business of defendants in Fort Worth, where they were engaged in the grocery and livestock feed business, and told the manager he desired to purchase some sorghum or syrup for the purpose of mixing it with other food products to feed his livestock; that defendants sent a helper to some place in the building and procured a can containing a substance resembling syrup and displayed it to plaintiff, and, after its inspection, plaintiff purchased it and paid the price asked. Plaintiff alleged that the container held about five gallons of the substance and that the lid was loose and apparently had been removed; that the helper, with the aid of plaintiff, tied the lid on the can with an ordinary baling wire, after which it was placed in plaintiff's trailer and he carried it to his home at Snyder in Scurry county; that on reaching home that afternoon, it being too late to feed his livestock, he left the trailer containing the merchandise in the driveway near the side of his house until the next afternoon; that at the time for feeding he removed the wire and lid from the container, which were precisely as they had been fixed at the time he received the goods from defendants, placed in a washtub a quantity of chopped grain food products, similar in all respects to that he had fed to his livestock for several months and which were free from poison or other injurious substances, and placed thereon about one-half gallon of the syrup purchased from defendants, stirred all together and fed it to fourteen head of his livestock; that the sorghum molasses, syrup, or substance so purchased by him from defendants contained poisonous ingredients, in that it contained arsenic in sufficient quantity to cause the death of his livestock. The stock that died as a result thereof consisted of twelve Jersey heifers, a bay mare, and a paint pony, all of the value of $720.

Plaintiff further alleged that defendants impliedly warranted to him that the merchandise so purchased was fit and proper in quality as a food for livestock when mixed with other feed of a proper kind. That defendants knew, or by the exercise

of ordinary care should have known, that the syrup or substance so sold was not fit for consumption by livestock, and that they were guilty of negligence and carelessness in selling such substance to plaintiff with the knowledge it was to be used for feed to livestock. Plaintiff prayed for judgment in the amount of his alleged damages.

The defendants presented several demurrers and exceptions to plaintiff's petition, but the record does not indicate they were acted upon by the court, and there is nothing presented for our consideration in this regard.

Defendants answered with a general denial and special answers, to the effect that the syrup was pure and wholesome when sold by them to the plaintiff; that it was purchased by them from wholesalers who in turn warranted or impliedly warranted to them that same was good and wholesome; that they purchased large quantities of syrup such as that sold to plaintiff and they received same in barrels and sold it out to farmers and stockmen for livestock food purposes and that they had never had a complaint from any other customer; that the principal part of their stock consisted of foodstuffs which is inclosed in sealed containers and is sold to their customers in like manner with seals unbroken, and that they have no means of examination of the contents and are therefore in no way responsible for the quantity and quality thereof; that the particular malt syrup which was sold to plaintiff was purchased in like manner from the wholesaler on representations that it was of suitable quality for human or animal consumption. Relying upon such warranties and representations of wholesalers, defendants sold said merchandise, and are in no way responsible for its qualities or its ingredients, and are guilty of no acts of negligence in connection therewith, and that, if the syrup contained arsenic, defendants had no knowledge thereof, and had no opportunity to discover it, and are therefore not chargeable with negligence in connection with same.

A jury trial was had, and the testimony which we consider important under the assignments of error presented was, in substance, as follows: Plaintiff testified that on October 31, 1934, he went into defendants' place of business in Fort Worth, where he had traded for some time, and was acquainted with the manager, Frank Pinto, and told him he had been feeding his cattle on feed mixed with syrup and water; that he had run out of sorghum and asked the manager if he had some syrup which he could sell to mix with feed for some heifers; the manager sent a helper to bring a five-gallon can of syrup; the lid was loose on it; plaintiff told Pinto it looked like it had been opened; they used a wire to tie it together; it looked like old thick sorghum; the price was paid and the can placed in the trailer, and he carried it to his home at Snyder, Tex. He did not arrive at home in time to feed the stock that evening, and he left his trailer containing the can of sorghum in the driveway next to the house until the next afternoon, when he and another man fed the stock; they placed a quantity of chopped grain, about a half gallon of syrup he had on hand and a half gallon of the syrup purchased from defendants along with water in a washtub, mixed it thoroughly and fed it to his stock; that the chopped feed and syrup on hand were such as he had been feeding to his stock for several months with no bad results, and that it contained no poison or substance detrimental to his stock, but was wholesome food for them; that the stock ate freely; that when they opened the can of syrup purchased from defendants the lid and the wire retaining it were in exactly the same condition they were in when placed there at defendants' place of business and had not been tampered with in any way. The next morning not an animal would eat a bite of food; that afternoon six or eight of the cows were sick, nauseated, and foaming at the mouth; veterinarians were called and the stock treated; he was advised to have the syrup analyzed; it was sent to the state laboratories at Austin for that purpose, but reports were delayed for some days; that a report was finally received. (This report was offered in evidence but upon objection by defendants was excluded by the court.) All the stock died within a few days; it killed all the cattle, not a single cow left. The twelve heifers, the bay mare, and the paint pony died; the value of the heifers was $60 each, the mare was worth $125, and the paint pony was worth $60 or $70. A portion of the contents of the can of syrup was, by plaintiff, poured into a clean bottle and brought to Fort Worth; the bottle and its contents were in evidence. (It does not appear from the evidence when the syrup was transferred from the can to the bottle nor when it was brought to Fort Worth for analysis.) That plain-

tiff gave Mr. Ward a portion of the contents of the bottle for analysis.

W. R. Ward·testified, at the instance of plaintiff, in substance: That he lived at Fort Worth; that he was by profession a pharmacist and had been such for 42 years; had experience for that time in mixing and putting together chemicals.

"Question: Mr. Ward, in the course of your experiments and mixing of chemicals over that period of time, and the putting of them into their component parts, have you had occasion daily to work with compounds and composition of chemical elements, and both with mixing and breaking them up? Answer: Yes, sir, I have.

"Question: Can you, as a result of your experience and your knowledge of chemistry and of the chemical reactions of the elements to each other, take a substance such as I hold in my hand in this bottle and make a test and determine the different components of that? Answer: Yes, sir." (The qualification of Mr. Ward as an expert to make the analysis and to testify as to the result was objected to by defendants, the objection being overruled by the court.)

The witness testified that at the request of counsel for plaintiff he did make an analysis of a sample taken from the bottle exhibited and that from the analysis he found it to contain arsenic, amounting to about 4 per cent.; that from his experience he considered that amount of arsenic in a large amount of feed would be fatal to livestock; that arsenic is commonly known as a deadly poison. The witness Ward was not cross-examined by defendants' counsel.

Defendants' testimony, as given by Frank Pinto, shows: That defendants purchased two different kinds of syrup prior to the sale to plaintiff, in ten barrel lots each; they purchased from wholesalers at Dallas at different times; it was purchased as malt syrup which could be used for stock and for making vinegar or beer; they had calls for stock feed during the fall and for that reason they bought the syrup; had sold the most of it prior to the sale to plaintiff; some was sold by the barrel; the syrup was all of the same kind; it had been sold for stock feed; had no complaints from any other customer; had some left after the sale to plaintiff and later sold it; the witness had no reason to suspect it contained arsenic, had even tasted it himself; defendants had purchased a large number of cans which had been discarded by a poultry concern; the syrup was all bought in barrels but some were opened and emptied into the cans because some customers wanted it in smaller quantities; the witness was present and supervised the placing of the syrup in the cans and inspected the cans at the time, and they appeared to be clean. He did not remember that he tasted the syrup in the can sold to plaintiff. Witness never saw any arsenic about defendants' store in his life, and would not know arsenic if he were to see it; no poison was ever kept in the store for sale except fly medicine in bottles.

R. N. Boyer testified, at the instance of defendants, that he purchased from them a barrel of syrup in September, 1934, and used it for stock food and had no bad results from it to his stock. Witness never bought any syrup from defendants in October, 1934, in tin cans.

At the close of the testimony, the defendants requested the court to instruct the jury to return a verdict in their favor, which request was refused, and the case was submitted to the jury on special issues. With definitions of negligence and proximate cause, about which there is no complaint, the first issue was: "Do you find from a preponderance of the evidence that at the time of the sale of the syrup in question by the defendants to the plaintiff, the said syrup contained arsenic?" This issue was answered: "Yes." Down to and including issue No. 7, issue No. 1 was followed by proper issues as to whether or not the arsenic content, if any, was poisonous to livestock, and if it was the proximate cause of the death, if any, of the livestock and followed by issues as to values, all of which were answered favorable to plaintiff.

Upon the answers of the jury to the issues submitted, the court entered judgment in favor of plaintiff for $470.

The first three propositions presented by defendants in their brief as grounds for reversal go to the action of the court in refusing their request for a peremptory verdict, on the grounds (a) the evidence offered no more than raised a suspicion that the syrup contained arsenic; (b) that plaintiff had failed to prove the syrup contained arsenic at the time it was sold; and (c) that there was no proof of the probable cause of the death of plaintiff's livestock.

■ We have stated somewhat at length the evidence before the court and have endeavored to give the details thereof as favorable to defendants' contention as the record will warrant, and from it we consider it reasonably sufficient to raise an issue for determination by the jury. We consider there is much more evidence of probative force than a mere scintilla, and enough that reasonable minds might differ in the conclusion reached. Under these conditions we hold the court should not have taken the case from the jury upon an instructed verdict.

Defendants' fourth proposition challenges the right of the court to submit special issues Nos. 1, 2, and 3, above quoted and referred to, for the reason there was no evidence that the syrup contained arsenic or that the eating of it by livestock was the proximate cause of their death.

■ In support of defendants' contention, we are cited to the rule announced by Texas Jurisprudence, vol. 17, p. 909, which, in substance, says the law has never attempted to say what amount or kind of evidence ought to produce a belief in the jury's mind but that there must be more than a scintilla of evidence; that the matters relied upon must be of some probative force and do more than raise a mere suspicion of the existence of a fact sought to be proved. Immediately following the expression referred to in Texas Jurisprudence, it is further said: "If discarding all adverse evidence and giving credit to all evidence that is favorable to the successful party and indulging every legitimate conclusion that is favorable to him, a jury might have found in his favor, then it is to be concluded there is evidence to support the verdict." The above quotation was taken from the case of Wininger v. Ft. Worth & D. C. Ry. Co., 105 Tex. 56, 143 S.W. 1150, and cited with approval in Cartwright v. Canode, 106 Tex. 502, 507, 171 S.W. 696, and Underwood v. Security Life & Annuity Co., 108 Tex. 381, 194 S. W. 585. Substantially following the language of the Supreme Court in the last-mentioned case, to apply the rule thus announced, we conclude that, considering the testimony of plaintiff in this case, to the effect that the syrup had not been tampered with after he bought it until fed to his stock, the feed with which it was mixed was such as he had previously fed to his stock without bad results, and that they immediately sickened and died and that a subsequent analysis of the syrup by a disinterested witness disclosed a 4 per cent. arsenic content, were very cogent circumstances from which the jury might reasonably find as it did in response to the first issue. Clearly, under these conditions, it was proper for the court to refuse to take the case from the jury and give an instructed verdict for the defendants. It follows, as stated in King & King et al. v. Porter et al. (Tex.Civ.App.) 256 S.W. 627, where the evidence is insufficient to support an instructed verdict, that a jury's finding thereon to the contrary is sufficient to support their verdict. We therefore overrule defendants' fourth proposition.

By their fifth, sixth, and ninth propositions, defendants complain of special issues Nos. 8 and 9, which submitted questions (a) Could defendants by the exercise of ordinary care have known of the presence of arsenic in said syrup? and (b) Was the failure, if any, of defendants to learn of the presence of the arsenic in the syrup a proximate cause of the death of plaintiff's livestock?

■■ We think the arguments and authorities by defendants under these propositions inapplicable to the points raised, yet the case was pleaded and tried upon the theory that defendants sold the goods to plaintiff with full knowledge of the purposes for which they were to be used and therefore warranted them to be fit for that purpose. There was the further allegation that defendants were negligent in selling the syrup to plaintiff while it contained such poisonous substance. Responding to these allegations, the defendants alleged they had purchased the goods from wholesalers in barrels and had no means of knowing that they contained poison, and relied upon the representations of the seller impliedly warranting that they were good and wholesome for man and beast. The rule seems to be that, where a wholesaler sells goods to a dealer for resale, there is no implied warranty of fitness for use. Needham v. Dial, 4 Tex.Civ.App. 141, 23 S.W. 240; Houk v. Berg et al. (Tex.Civ.App.) 105 S.W. 1176. This is especially true if the dealer sells the merchandise in the unbroken packages such as received by him from the wholesaler. Upon the other hand, there are many authorities in this state to the effect that, where an article is sold to one who desires to use or consume it for a particular purpose, and these facts are known to the seller, there is an implied warranty by the seller that the goods are fit for the purpose they

were intended to be used. Houk v. Berg et al., supra; Houston Cotton Oil Co. v. Trammell (Tex.Civ.App.) 72 S.W. 244; and many more cases to the same effect.

 The inquiries in the issues complained of were as stated: (a) Could the defendants by the exercise of ordinary care have known the syrup contained arsenic? and (b) Was the failure by defendants to learn of its presence, if any, a proximate cause of the death of plaintiff's livestock? These issues were answered in the affirmative. The syrup had been purchased in barrels from the wholesalers but certain of them had been emptied by defendants into secondhand cans or containers, and the part sold to plaintiff was not in the original containers in which they had been purchased by defendants. The evidence is undisputed that the lid on the can sold to plaintiff was loose and appeared to have been opened. Nothing is shown as to how long the can had been in that condition, nor in what part of the store it had been kept, nor who had access to it while there and in that condition; that it was taken home by plaintiff and on the next day was by him fed to his livestock in precisely the same condition as when purchased; that the stock died from eating it and that upon analysis it was found to contain poison. We think under these circumstances there was no error in the submission of the issues to the jury.

Seventh and eighth propositions challenge the rulings of the court in permitting the witness Ward to testify concerning the analysis of the syrup contained in the bottle presented by plaintiff as his Exhibit No. 1, upon the grounds that the witness did not properly qualify for that purpose. Without reiterating the witness' testimony concerning his experience and qualifications, we think it sufficient to entitle him to testify as he did. It is true he said he was a pharmacist for many years, but he also said that, from his knowledge of chemistry and his experience of chemical reactions of the elements to each other, he could take a substance such as the contents of the bottle exhibited and make a test and determine the different component parts of it. As we understand it, this is about all any chemist could do. We therefore hold he showed himself competent to testify to the matters inquired about. The objection to his testimony did not go to his answers because of the length of time elapsed between the time of sale and the experiment, nor because it was not shown the syrup was in the identical condition as when sold. We overrule the assignments upon which these propositions are based.

All assignments of error are overruled, and the judgment of the trial court is affirmed.